ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

ANDREW PAULSON (CABN 267095)
MOLLY K. PRIEDEMAN (CABN 302096)
Assistant United States Attorneys

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    andrew.paulson@usdoj.gov
    molly.priedeman@usdoj.gov

Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) **CASE NO. 4:23-cr-00212-YGR** |
|     Plaintiff, | ) **UNITED STATES' SENTENCING** |
|     v. | ) **MEMORANDUM AND MOTION FOR** |
| | ) **UPWARD DEPARTURE OR UPWARD** |
| | ) **VARIANCE** |
| ANDREW JONES, | ) |
|     Defendant. | ) Hearing Date: November 15, 2023 |
| | ) Time: 2:00 p.m. |
| | ) Judge: Hon. Yvonne Gonzalez Rogers |

1

## **TABLE OF CONTENTS**

2  I.     INTRODUCTION……………………………………………………….……………… 1

3  II.    OFFENSE CONDUCT……………………………………………………….…………… 1

4       A.  Jones Created an Atmosphere of Fear and Intimidation That Allowed Him to Prey on the

5           Women Under His Control……………………………………………………………….… 1

6       B.  Jones's Sexual Abuse of C.V……………………………………………………………… 2

7       C.  Jones's Sexual Abuse of J.L……………………………………………………………… 3

8       D.  Jones's Abuse of R.C……………………………………………………………………… 4

9       E.  Jones's Abuse of J.H……………………………………………………………………… 4

10      F.  Jones Attempts to Lie His Way Out of Trouble………………………………………… 5

11 III.   THE GUIDELINES CALCULATION………………………………………………… 6

12      A.  The 2023 Amendments to the Guidelines………………………………….……… 6

13          1.  *The Commission Raises the Base Offense Level for Sexual Abuse of a Ward by Four*
               *Levels While Simultaneously Implementing a Two-Level Reduction for Certain Zero-*
14             *Point Offenders*………………………………………………………………………….... 6

15          2.  *Jones is Not Entitled to a Further Two-Level Reduction as a Zero-Point Offender*
               *Because He Used Violence and Credible Threats of Violence in Connection with the*
16             *Offense Involving J.L*………………………………………………………...………… 9

17      B.  The PSR Accurately Calculates the Offense Level and Criminal History Category………. 10

18 IV.    OBJECTIONS TO THE PSR…………………………………………………………... 10

19      A.  The Government's Objection to the PSR's Failure to Include Information Related to Jones's

20          Sexual Abuse of J.H………………………………………………………………… 10

21      B.  The Defense's Objections to Information Related to Jones's Possession of Child

22          Pornography and Other Relevant Conduct…………………………………………… 12

23 V.     SENTENCING RECOMMENDATION…………………………………………….. 14

24      A.  Legal Standard………………………………………………………………………… 14

25      B.  The Government's Recommended Sentence of 96 Months is Sufficient but not Greater than

26          Necessary…………………………………………………………………………… 15

27 //

28 //

1.  The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant……………………………………………………………………… 15

2.  The Need for the Punishment to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment………………………… 17

3.  The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct…. 17

4.  The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants……………………………………………………………………….. 18

VI.  CONCLUSION…………………………………………………………………… 19

1

## <u>**TABLE OF AUTHORITIES**</u>

2

### <u>*Cases*</u>

3

4

*Concepcion v. United States*, 597 U.S. 481 (2022) ............................................................... 11

*Nichols v. United States*, 511 U.S. 738 (1994) .................................................................... 11

5

6

*United States v. John Bellhouse*, Case No. 4:22-cr-00066-YGR………………………..…18

7

*United States v. Berry*, 258 F.3d 971 (9th Cir. 2001) .......................................................... 11

8

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) .......................................................... 14

9

*United States v. Enrique Chavez*, Case No. 4:22-cr-00104-YGR……………………………. 6

10

*United States v. Franklin*, 18 F.4th 1105 (9th Cir. 2021) .............................................. 11, 13

11

*United States v. Garcia,* Case No. 4:21-cr-00429-YGR………………………………………..6

12

*United States v. Mullings*, 15-cr-00538 (E.D.N.Y., May 13, 2016)…………………………….18

13

*United States v. Herbert*, 813 F.3d 551 (5th Cir. 2015) ...................................................... 17

14

*United States v. James Highhouse*, Case No. 4:22-cr-00016-HSG…………………….……. 6, 18

15

*United States v. Jimenez*, 451 F.3d 97 (2d Cir. 2006) ........................................................... 9

16

*United States v. Johnson*, 497 F.3d 723 (7th Cir. 2007) ....................................................... 9

17

*United States v. Ross Klinger*, Case No. 4:22-cr-00031-YGR…………………………………18

18

*United States v. Hosea Lee*, 5:21-cr-00084-DCR-MAS (E.D. Ky, August 1, 2022)……………….....18

19

*United States v. Lopez*, 998 F.3d 431 (9th Cir. 2021)........................................................... 9

20

*United States v. Mullings*, 15-cr-00538 (E.D.N.Y., May 13, 2016)………………………………18

21

*United States v. Nakie Nunley*, Case No. 4:23-cr-00213-YGR…………………………………18

22

*United States v. Pace*, 48 F.4th 741 (7th Cir. 2022) ............................................................ 9

23

*United States v. Perry*, 371 F. App'x 816 (9th Cir. 2010)................................................... 10

24

*United States v. Randall*, 34 F.4th 867 (9th Cir. 2022) ........................................................ 1

25

*United States v. Redlightning*, 624 F.3d 1090 (9th Cir. 2010)............................................ 12

26

*United States v. Reyes*, 772 F.3d 1152 (9th Cir. 2014)................................................... 14, 17

27

28

*United States v. Sandoval-Sianuqui*, 632 F.3d 438 (8th Cir. 2011) ............................................ 9

*United States v. Darrell Smith (a/k/a "Dirty Dick Smith")*, Case No. 4:23-cr-00110-YGR ................18

*United States v. Thames*, 214 F.3d 608 (5th Cir. 2000) ............................................ 17

*United States v. Valle*, 940 F.3d 473 (9th Cir. 2019) ............................................ 11

## *Statutes*

18 U.S.C. § 1001(a)(2) ............................................ 21

18 U.S.C. § 2243(b) ............................................ 21

18 U.S.C. § 2243(c) ............................................ 8

18 U.S.C. § 3014(a) ............................................ 1

18 U.S.C. § 3553(a) ............................................ 11, 15

18 U.S.C. § 3553(a)(1) ............................................ 12

18 U.S.C. § 3553(a)(2) ............................................ 14

18 U.S.C. § 3553(f)(2) ............................................ 9

18 U.S.C. § 3661 ............................................ 10, 12

## *Rules*

U.S.S.G. § 1B1.3(a)(1)(A) ............................................ 10, 12

U.S.S.G. § 1B1.4 ............................................ 10

U.S.S.G. § 5C1.2(a)(2) ............................................ 9

U.S.S.G. § 5K2.0(a)(1)(B) ............................................ 14

## *Regulations*

88 Fed. Reg. 7180 (Feb. 2, 2023) ............................................ 7

88 Fed. Reg. 7227 (Feb. 2, 2023) ............................................ 7

## I.     INTRODUCTION

As a prison guard at FCI Dublin, Andrew Jones had immense power over the lives of the women confined within its walls.  This is particularly true of the women who worked under his supervision in the kitchen—women over whom he had direct, immediate, and daily control.  Jones used the power invested in him by the federal government to demean, intimidate, threaten, groom, and sexually abuse multiple women who, as prisoners whose slightest infractions were subject to punishment by Jones and other guards, were helpless to resist.  Each of the women Jones abused were sent to FCI Dublin to pay their debt to society, but instead found themselves at the mercy of a guard and a boss who used the tools of coercion at his disposal to abuse them for his own sexual pleasure.

On August 17, 2023, Jones pleaded guilty to six counts of sexual abuse of a ward involving three inmates and one count of false statements to the Department of Justice Office of Inspector General (DOJ OIG).  Because the Guidelines range fails to account for the seriousness of Jones's crimes, the government respectfully moves this Court to vary or depart upward and impose a sentence of 96-months' imprisonment, 10 years supervised release, and a $30,700 special assessment.[1]

## II.     OFFENSE CONDUCT

### A.  Jones Created an Atmosphere of Fear and Intimidation That Allowed Him to Prey on the Women Under His Control

Jones was a correctional officer at FCI Dublin who worked in the kitchen as a Cook Supervisor. In that role, Jones had supervisory and disciplinary authority over all the female prisoners.  He used that authority to victimize numerous women who worked for him in the kitchen.  Moreover, to enforce the silence that was so critical to the perpetuation of his predation, Jones created an environment of intimidation, fear, and reprisal.  Multiple prisoners reported that Jones was rude and unprofessional in his interactions with them, and regularly cursed at them and called them names such as "base head bitch,"[2] "bitches," "snitch bitches,"[3] "crackheads," and "motherfucker."  Several inmates said that Jones reserved

---

[1] The $5,000 mandatory special assessment under 18 U.S.C. § 3014(a) must be imposed on a per-count basis.  *United States v. Randall*, 34 F.4th 867, 877 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1061, 215 L. Ed. 2d 283 (2023).

[2] This is a reference to someone who is addicted to freebase or crack cocaine.  Several of the women who Jones supervised in the kitchen struggled with drug addiction.

[3] A "snitch" is a derogatory term for someone who reports wrongdoing to authorities.

the worst of his ire for Spanish-speaking inmates.  According to one prisoner, Jones would say things to them such as, "You fucking Mexican," "You piece of shit," and "I'll slap the shit out of you."

It wasn't just words.  Jones also enforced silence and obedience through violence and threats of violence.  For example, Jones threatened to "beat [J.L.'s] ass," and on one occasion punched her in the chest during an argument they were having in the kitchen.  R.C., one of Jones's other victims, saw the abuse, and Jones reacted by pushing her.

In the context of the fear of reporting that this atmosphere created, Jones groomed the women for his pleasure.  Various inmates reported that Jones frequently talked about his penis, referring to it as a "life changer."  He also complimented particular prisoners who he singled out for abuse, making comments about their bodies, specifically their buttocks.  The intimidation and insults on the one hand, and the flattery on the other, was aimed at cultivating pliant prisoners who Jones could abuse for his own sexual pleasure, while he remained safe in the belief that his misconduct would go unreported.

**B.  Jones's Sexual Abuse of C.V.**

Jones began at FCI Dublin on May 24, 2020 and started abusing C.V. a little more than a month later.  As C.V.'s boss in the kitchen, Jones had daily access to and control over C.V.  C.V. said that Jones was rude to the prisoners and would become angry when he did not get his way.  Once she told Jones she could cook, however, he was nicer to her, and complimented her.  This made her feel good.

The months-long sexual abuse of C.V. began in July 2020.  Sometime before Jones's birthday, he brought C.V. into the staff bathroom in the kitchen.  Jones unlocked the bathroom, told C.V. to go inside, and then followed her in.  Once inside, Jones locked the door behind them and left his keys in the door to ensure no other officers could enter the bathroom.  Jones and C.V. kissed and touched each other, and Jones told her his penis would be a "life changer" because he knew she had never had sex with a non-Mexican.  Jones then instructed C.V. to get on her knees.  C.V. complied.  While Jones was standing, C.V. performed oral sex on Jones while she was on her knees.  Jones ejaculated in C.V.'s mouth and cleaned himself off with wipes that he kept in his pocket.  C.V. was concerned about losing her job in the kitchen if she refused to give Jones oral sex.  After the abuse, C.V. returned to work.

The following day, Jones again brought C.V. into the staff bathroom in the kitchen.  Once inside, Jones put his keys in the lock, ensuring seclusion.  C.V. performed oral sex on Jones while he was standing,

and she was on her knees.  Jones then directed C.V. to turn around and pull her pants down.  Once again, C.V. complied.  C.V. got on her hands and knees on the ground and Jones penetrated C.V.'s vagina from behind with his penis.

In various locations in the FCI Dublin kitchen over the next five months, Jones had vaginal and/or oral sex with C.V. almost every day he worked.  Jones refused to wear a condom during the abuse; he told C.V. he was allergic to latex.  Because of the environment Jones created, C.V. did not want to deny Jones sex while at work because when Jones had his way and had sex with C.V., he was in a much better mood.  When he did not get his way, however, Jones would become angry and would treat the prisoners in the kitchen poorly.

The last time Jones had sex with C.V. was in early 2021.  Thereafter, C.V. confronted Jones regarding rumors that he was in relationships with other inmates.  Though the abuse stopped, Jones's intimidation of C.V. did not.  On August 29 or 30, 2021, two inmates who worked in the kitchen attacked C.V.  The inmates told C.V. that Jones had said that C.V. had snitched on them for taking food from the kitchen.  After that attack, one of the inmates joked about Jones's "life changer," a term that Jones frequently used to refer to his penis, including during the first time he received oral sex from C.V.  C.V. understood this inmate's references to Jones's penis as an indication that she too was in a sexual relationship with Jones.

**C.  Jones's Sexual Abuse of J.L.**

After abusing C.V., Jones moved on to his next target: J.L.  J.L. began working in the kitchen in November 2020.  At first, Jones was disrespectful to her.  Jones threatened to "beat [J.L.'s] ass."  On one occasion, he made good on that threat, punching J.L. in the chest during an argument he and J.L. were having in the kitchen.  Another of Jones's victims, R.C., saw the assault, and Jones reacted by pushing her.  In March or April 2021, however, Jones's interactions with J.L. changed.  Jones began flirting with J.L., sharing personal details about his life with her, and making comments about her butt.

Sometime between March and May 2021, Jones summoned J.L. from her housing unit to the kitchen.  Jones told J.L. to get some food out of the freezer.  As she entered the freezer, Jones followed her.  Once inside, Jones tried to kiss J.L., but she demurred.  Jones then lifted J.L.'s shirt and bra, exposing her breasts.  Jones groped J.L.'s bare breasts and sucked on one of her breasts.  J.L. was in shock.  Like

with C.V., this abuse occurred within the toxic environment Jones had created.  Understandably, J.L. felt trapped, with no way to say no to Jones's advances.

The abuse did not stop there.  Sometime before June 30, 2021, Jones took J.L. to the kitchen warehouse, unlocked the door, ordered her to wait inside, and then locked the door behind her.  Jones entered the warehouse through another door that was attached to another guard's office.  Once inside and alone, Jones kissed J.L. and instructed her to turn around and bend over.  He then pulled her pants down and had sex with her from behind.  After that, J.L. turned around, knelt, and gave Jones oral sex while he stood in front of her.  Jones ejaculated in J.L.'s mouth.  Following the assault, J.L. did not return to the kitchen for a week because she did not want to see Jones.

### D.  Jones's Abuse of R.C.

Jones's abuse of R.C. followed a similar path.  She began working for Jones in the kitchen in approximately March 2021.  Eventually Jones began flirting with R.C.  Sometime between March and April 2021—shortly after R.C. started working for Jones—Jones was alone with R.C. in the staff bathroom in the kitchen.  On that occasion, she licked and kissed Jones's penis.

Between March and June 2021, Jones had vaginal and/or oral sex with R.C. multiple times.  On one of those occasions, Jones entered the room in the kitchen where the utensils were kept, also referred to as the "hot room."  R.C. was putting away some utensils.  Once inside, Jones had sex with R.C., and stopped when they heard someone approaching.  On another occasion, Jones and R.C. went into a bathroom in the kitchen where Jones received oral sex from R.C. before having vaginal sex with her.

Jones didn't just abuse R.C. on his own; he enlisted other prisoners to assist.  According to one of those prisoners, L.C., approximately four times per week, Jones instructed L.C. to serve as a lookout when he was in the back of the kitchen with R.C., and to inform him if any other guards approached.  This prisoner also stated that Jones and R.C. would be in the office alone together during the 3:30 p.m. count when most of the inmates were back in the housing units, and other times during dinner when most of the inmates were in the front of the kitchen.

### E.  Jones's Abuse of J.H.

Unfortunately, C.V., J.L., and R.C. were not Jones's only victims.  J.H. worked in the kitchen from January to February 2020, and then again from about March 2020 until about January 2022 when she left

the kitchen following a sexual encounter with Jones.[4]  According to J.H., Jones was "cool" at first.  When she told Jones where she was from, Jones said that was weird because he had an ex-girlfriend from there who looked like J.H.  As part of his desensitizing and grooming of J.H., Jones showed her pictures both of his penis and also of his children on his watch.  At some point, Jones began following J.H. when she went to the vegetable prep or butcher prep stations.  During those trips, Jones began touching and grabbing J.H. by the arm and waist.  According to J.H., on more than five occasions, Jones also touched her buttocks over her clothes and kissed her, each time in the vegetable prep or butcher prep stations.

J.H. said that she was frequently unable to withstand peer pressure, and that Jones was persistent in his sexual pursuit of her.  Jones told J.H. that when she got out, he wanted to have a baby with her.  In the beginning, she tried to stop Jones, but eventually she gave in.

At some point, Jones started making comments to J.H. regarding when they were going to have sex.  One day approximately one to two months before J.H. quit working in the kitchen, Jones asked her, "Are you ready?"  He then told her to follow him to the "hot room" (the same room where Jones and R.C. had sex).  Once inside, Jones closed the door and told J.H. to pull down her pants.  She complied.  Jones then stuck his penis in her vagina, and they had sex for about three minutes, when J.H. asked Jones to stop.  J.H. got dressed and walked out.

After this incident, J.H. said that she stopped talking to Jones, who no longer tried to pursue her.  The relationship became strictly work-related, and J.H. tried to avoid Jones.

### F.  Jones Attempts to Lie His Way Out of Trouble

On March 23, 2022, DOJ OIG agents executed a search warrant at Jones's residence and spoke with Jones.  During that interview, Jones denied sexually abusing any prisoners.  Among his lies, Jones specifically denied ever having sex with C.V., even though he had sex with C.V. repeatedly for months.

During the search, agents found an external hard drive containing thousands of videos and images, the majority of which were sexual in nature.  Also on the hard drive were 45 videos and 2 images of child pornography.  An analysis by the National Center for Missing and Exploited Children (NCMEC) showed that 29 of the videos belonged to eight known series of child pornography.

---

[4] The information in this section is taken from the FBI-302 summarizing J.H.'s statement to agents.  Declaration of Andrew Paulson (Paulson Decl.), Ex. 1.

UNITED STATES' SENTENCING MEMORANDUM
4:2-CR-00212-YGR                    5

## III.    THE GUIDELINES CALCULATION

### A.  The 2023 Amendments to the Guidelines

> 1.   *The Commission Raises the Base Offense Level for Sexual Abuse of a Ward by Four Levels While Simultaneously Implementing a Two-Level Reduction for Certain Zero-Point Offenders*

The recent cases involving FCI Dublin guards, as well as others around the country, exposed the gross inadequacy of the Guidelines to accurately capture the severity of the sexual abuse of prisoners by guards who are supposed to protect them.   To date, all the recent sentences for FCI Dublin guards convicted of sexual abuse of a ward and/or abusive sexual contact of a prisoner have resulted in above-Guidelines sentences.   *See United States v. James Highhouse*, Case No. 4:22-cr-00016-HSG (84-months' imprisonment (24-30 month Guideline range)); *United States v. Enrique Chavez*, Case No. 4:22-cr-00104-YGR (20-months' imprisonment (10-16 month Guideline range)); *United States v. Garcia*, Case No. 4:21-cr-00429-YGR (70-months' imprisonment (46-57 month Guideline range)).   As Judge Gilliam stated during the *Highhouse* sentencing, "I was amazed when I saw what the guidelines range for this conduct is.   It seems . . . radically inconsistent with the actual nature of the harm done in terms of the frequency, the seriousness of the offense, and all the factors that I just talked about. . . . [I]t strikes me that the guidelines here substantially underrepresent the seriousness of the conduct."   *Highhouse* Sent. Tr. 12:22-13:12.   This Court expressed similar sentiments during the *Chavez* sentencing: "It is difficult for me to understand why frankly the guidelines for this kind of conduct are so low.   I don't know what the Sentencing Commission was thinking about when they—when they put these together."   *Chavez* Sent. Tr. 23:23-24:1.

The Department of Justice also voiced concerns.   Echoing this Court's comments, the Deputy Attorney General (DAG) told the Commission, "[T]he current guideline provisions applicable to sexual abuse of a ward . . . are insufficiently punitive in light of the egregious conduct at issue and are at odds with the statutory maximum penalties provided by Congress and the far more onerous guidelines that apply to other comparable sex offenses."[5]   The Criminal Division of the Department of Justice similarly

---

[5] Lisa O. Monaco, Deputy Attorney General, *Letter to the Honorable Carlton W. Reeves, Chair of the United States Sentencing Commission*, at 2 (Oct. 17, 2022), https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/20221017/doj-dag.pdf (hereinafter referred to as the "DAG Letter").

stated that the offense level for sexual abuse of a ward "fails to account for the coercive nature of the prison environment and the disparate power dynamic between the corrections officer and victim."[6] As the DAG and the Department of Justice noted, this problem was exacerbated by the fact that "[m]ost, if not all, defendants prosecuted under this statute are federal employees, who by nature of their occupation and conditions of employment, will not have a criminal history." DAG Letter at n.2.

On February 2, 2023, the Sentencing Commission proposed raising the base offense level for sexual abuse of a ward eight levels from 14 to 22.[7] In its discussion of the Proposed Amendments, the Commission specifically referred to the Department of Justice's letter. *Id.* at 7226. In a separate proposal, the Commission proposed adding a new "Zero Point Offenders" section to the Guidelines. *Id.* at 7221-22. Under this new provision, offenders who had zero criminal history points and who met certain criteria would get a two-level reduction of their offense level. Notably, although both the alternative proposals for this new zero-point offender section included a carve out for "sex offenses," they narrowly defined "sex offenses" to include only certain crimes against minors. *Id.*

In its response to the Proposed Amendments, the Department of Justice noted that the addition of this zero-point offender reduction would stunt the impact of the increase in the offense level for sexual abuse of a ward. It stated:

> The proposed amendment would also offset in part the Commission's proposed amendment to raise the base offense level for §2A2.3, which covers sexual abuse of a ward. As the Department has explained in previous submissions, defendants sentenced under these Guidelines—who are largely BOP employees or other federal law enforcement officers—typically do not have a prior criminal history, and the Commission's proposal targeting zero-point offenders would therefore cover them.[8]

---

[6] Kenneth A. Polite, Jr., Assistant Attorney General of the Criminal Division, and Jonathan J. Wroblewski, Director, Office of Policy and Legislation of the Criminal Division, *Letter to the Honorable Carlton W. Reeves, Chair of the United States Sentencing Commission*, at 21-22 (Sept. 12, 2022), https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/20221017/doj.pdf.

[7] U.S. Sentencing Comm'n, *Sentencing Guidelines for United States Courts,* 88 Fed. Reg. 7180, 7227 (Feb. 2, 2023) (available at https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230201_RF-proposed.pdf (hereinafter, the "Proposed Amendments").

[8] Jonathan J. Wroblewski, Director, Office of Policy and Legislation of the Criminal Division, *Letter to the Honorable Carlton W. Reeves, Chair of the United States Sentencing Commission*, at 40 (Feb. 27, 2023), https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/202303/88FR7180_public-comment.pdf#page=387.

1   Other groups expressed similar concerns with the zero-point offender proposal.[9]

2        Despite these warnings, the Commission adopted the proposed zero-point offender reduction as

3   the newly enacted § 4C1.1.  And though the provision excludes from the zero-point offender reduction

4   those who commit a "sex offense," true to the proposals, it narrowly defines a "sex offense" as a select set

5   of crimes against children.[10]  The Commission also increased the base offense level for sexual abuse of a

6   ward, but only by four levels instead of the eight it had originally proposed.  *Id.* at § 2A3.3.  In the end,

7   these provisions combine to result in a mere two-level increase for the base offense level for sexual abuse

8   of a ward, unless the defendant has one criminal history point—an unlikely scenario, as the Department

9   of Justice and other entities pointed out to the Commission—or the zero-point offender provision for some

10  reason does not apply.  What is more, the Commission made the zero-point offender reduction retroactive,

11  which means that for all sexual abuse of a ward crimes committed prior to November 1, 2023, not only

12  will prison guards who sexually abuse their wards receive the benefit of the prior, grossly inadequate

13  Guidelines level that the Commission sought to remedy, but they are also potentially eligible for a further

14  two-level reduction as a zero-point offender.[11]

15       That is the issue the Court must grapple with in this case.  Jones committed his offenses prior to

16  November 1, 2023, so the old Guidelines levels unarguably apply, thus allowing Jones to evade the new,

17  increased offense level.  In addition to that, Jones is potentially eligible for a further two-level reduction

18  through the zero-point offender provision, which applies to him retroactively.  The Court must therefore

19  determine whether Jones is entitled to a further two-level reduction in the total offense level under § 4C1.1.

20

21  _____

[9] Mary Graw Leary, Chair, Victims Advisory Group, *Letter to United States Sentencing Commission*, at 29-30 (Mar. 12, 2023),
22  https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/202303/88FR7180_public-
    comment.pdf#page=387 ("Law enforcement, prison guards . . . all severely victimize others in part because of their status and
23  would now be rewarded a second time by exploiting this status beyond what is appropriate at sentencing."); Probation Officers
    Advisory Group, *Letter to the Honorable Carlton W. Reeves, Chair of the United States Sentencing Commission*, at 22 (Mar. 13,
24  2023),            https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/202303/88FR7180_public-
    comment.pdf#page=387 ("[T]h vast majority of the defendant's committing [the offense of sexual abuse of an individual in
25  federal custody under 18 U.S.C. § 2243(c)] will have had no prior convictions based on the background checks required to
    obtain those positions, though those individuals could potentially receive a benefit from this structure of guideline reduction
26  (unless this conviction is ultimately included as a covered sex crime and that option also included in the § 4C1.1 criteria).").

[10] Amendments to the Sentencing Guidelines (Apr. 27, 2023), https://www.ussc.gov/sites/default/files/pdf/amendment-
27  process/reader-friendly-amendments/202305_RF.pdf.

[11] Amendments to the Sentencing Guidelines (Aug. 31, 2023), https://www.ussc.gov/sites/default/files/pdf/amendment-
28  process/reader-friendly-amendments/202308_RF-retro.pdf.

1    For the reasons set forth below, the Court should not apply the zero-point offender reduction.[12]

2            2.    *Jones is Not Entitled to a Further Two-Level Reduction as a Zero-Point Offender*
3                  *Because He Used Violence and Credible Threats of Violence in Connection with the*
                   *Offense Involving J.L.*

4            Jones bears the burden of proving he is entitled to the zero-point offender reduction.   Courts

5    interpreting 18 U.S.C. § 3553(f)(2)—the safety valve statute that employs language identical to that in the

6    newly enacted § 4C1.1—have uniformly held that defendants bear the burden to prove eligibility by a

7    preponderance of the evidence.   *See*, *e.g.*, *United States v. Lopez*, 998 F.3d 431, 433 n.1 (9th Cir. 2021);

8    *United States v. Jimenez*, 451 F.3d 97, 102–03 (2d Cir. 2006); *United States v. Pace*, 48 F.4th 741, 751

9    (7th Cir. 2022).   Jones cannot meet this burden here.

10           Jones used violence and credible threats of violence to coerce and manipulate J.L. into engaging

11   in sexual acts with him, and to deter her from reporting this abuse.   J.L. was understandably afraid of Jones

12   and reluctant to report his abuse because he threatened to "beat [her] ass," and told her that she was going

13   to get in trouble.   It wasn't just words; Jones also used his fists.   During an argument in the kitchen, Jones

14   punched J.L. in the chest.   Jones's other victim, R.C., saw the battery, and Jones reacted by pushing her.

15           The atmosphere of intimidation and fear that Jones's violence and threats engendered left J.L.

16   feeling as though she never had the opportunity or the ability to say no to Jones's sexual advances and

17   made her fearful of reporting her abuse—a result that allowed Jones not only to prey on J.L., but also to

18   continue preying on other women as his abuse went undetected.   Courts interpreting identical language in

19   the context of safety valve eligibility under 18 U.S.C. § 3553(f)(2) and U.S.S.G. § 5C1.2(a)(2) have found

20   that similar behavior constitutes "violence or credible threats of violence."   The Eighth Circuit, for

21   example, denied safety valve relief to a defendant who slapped a coconspirator in the face while the two

22   were in jail, called him a traitor in Spanish, and said that he would "lose out or be killed."   *United States*

23   *v. Sandoval-Sianuqui*, 632 F.3d 438, 443 (8th Cir. 2011).   The Court in that case stated, "If a defendant

24   assaults and threatens a cooperating witness for the purpose of obstructing or impeding the investigation,

25   prosecution, or sentencing of his offense of conviction, it follows that the defendant has used violence or

26   credible threats of violence for the purpose of attempting to avoid detection or responsibility for the

27

28   ───────────────
     [12] Notably, the total offense level in this case under the old Guidelines is identical to the total offense level under the
     amended Guidelines with application of the two-level zero-point offender reduction (both result in a total offense level of 20).

offense of conviction." *Id.* Other Circuits, including the Ninth Circuit in unpublished opinions, have reached similar conclusions. *See, e.g., United States v. Johnson*, 497 F.3d 723, 726 (7th Cir. 2007) (defendant used credible threats of violence during "heated" argument in the workplace during which the defendant kicked a crate to get government cooperator's attention, asked her why she lied to law enforcement, told her she would have to live with what she had done, and directed profanities at her); *United States v. Perry*, 371 F. App'x 816, 817 (9th Cir. 2010) (defendant used credible threat of violence to dissuade informant from cooperating with police when defendant said that if informant were wearing a wire, he would "fucking kill" her).

Because Jones used violence and credible threats of violence in connection with the offense against J.L., he cannot meet his burden of proving that he is entitled to the zero-point offender reduction. The Court should instead apply the Guidelines level agreed to by the parties in the Plea Agreement.

**B. The PSR Accurately Calculates the Offense Level and Criminal History Category**

The government agrees that Jones does not have any criminal history points and therefore is a Criminal History Category (CHC) I. The PSR properly calculates the Guidelines in this case, which are set forth again in Appendix A for the Court's convenience. With a CHC of I and a total offense level of 20, the advisory guidelines here are 33-41 months.

**IV.    OBJECTIONS TO THE PSR**

**A.  The Government's Objection to the PSR's Failure to Include Information Related to Jones's Sexual Abuse of J.H.**

The government objects to the PSR's failure to include information related to Jones's sexual abuse of J.H. The PSR indicates that this information was not incorporated because it was not "relevant conduct" to an offense of conviction under U.S.S.G. § 1B1.3(a)(1)(A) and therefore "cannot be considered." PSR Addendum ¶ 3. This misses the point. As Probation acknowledges in its response to Jones's objections, in determining an appropriate sentence, "the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4; 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); PSR Addendum ¶ 6.

Thus, even if Jones's sexual abuse of J.H. is not "relevant conduct" to an offense of conviction, that does not mean it cannot, or should not, be considered by the Court.  Indeed, the PSR contains a host of facts that are not considered "relevant conduct" under the Guidelines, many of which were provided by Jones himself.  *See, e.g.*, PSR ⁋⁋ 82-98 (discussing "Offender Characteristics").  This information is included because the Court is statutorily obligated to consider not just "relevant conduct" as the Guidelines define that term, but also facts that pertain to the factors set forth in 18 U.S.C. § 3553(a), which include the "nature and circumstances of the offense and the history and characteristics of the defendant."

When it comes to evaluating these § 3553(a) factors, district courts enjoy "broad discretion to consider all relevant information" at sentencing, *Concepcion v. United States*, 597 U.S. 481, 491 (2022), so long as the information has "some minimal indicia of reliability to support its probable accuracy," *United States v. Berry*, 258 F.3d 971, 976 (9th Cir. 2001).  *See also Nichols v. United States*, 511 U.S. 738, 747 (1994) (sentencing courts "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come").  "The defendant typically has the burden to show that disputed hearsay is false or unreliable."  *United States v. Franklin*, 18 F.4th 1105, 1114 (9th Cir. 2021).  A district court's decision to consider information at sentencing over objections to its reliability is reviewed for abuse of discretion.  *Berry*, 258 F.3d at 976.

The Ninth Circuit's decision in *United States v. Valle*, 940 F.3d 473 (9th Cir. 2019) does not change this analysis.  In that case, the district court made a factual finding that resulted in a 12-level enhancement in the offense level and an increase in the CHC from II to IV, even though the government presented zero evidence to support the finding.  *Id.* at 476-78.  This resulted in an upward shift in the Guidelines range from 1-7 months to 37-46 months—a more than 400% increase.  The Ninth Circuit held that in cases that have an "extremely disproportionate impact" on the sentencing range, the government must prove the facts underlying that Guidelines enhancement by clear and convincing evidence.  *Id.* at 479-480.  Applying that standard, the Ninth Circuit found that the government failed to meet its burden because the factual finding was "unsupported by any direct evidence in the record."  *Id.* at 481.

That is not the case here.  Consideration of Jones's abuse of J.H. has no effect whatsoever on the Guidelines range.  Indeed, even if Jones had pleaded guilty to sexually abusing J.H., it would have had no effect on the Guidelines range.  Moreover, nothing in *Valle* or its progeny necessitates the presentation of

under oath testimony as a precursor for the Court to consider evidence proffered by either party.  All that is required for purposes of the § 3553(a) factors is that the evidence bear "some minimal indicia of reliability to support its probable accuracy."  *Berry*, 258 F.3d at 976.

Here, J.H.'s allegations of abuse bear far more than a minimal indicium of reliability, and Jones cannot prove otherwise.  J.H.'s account of Jones's grooming and sexual abuse of her is consistent with how Jones groomed and sexually abused C.V., J.L., and R.C., the three prisoners Jones admitted to sexually abusing in the Plea Agreement.  *See United States v. Redlightning,* 624 F.3d 1090, 1120 (9th Cir. 2010) ("Evidence that tends to show that [a defendant] committed another sexual assault . . . tends to show that [the defendant] had the propensity to commit another sexual assault.").  In fact, Jones had sexual intercourse with J.H. in the "hot room"—the same room where Jones admitted to having sexual intercourse with R.C.  *See* Plea Agreement ¶ 2(i).  The facts that Jones himself has agreed to in the Plea Agreement thus corroborate J.H.'s account.  As a result, the Court should consider Jones's abuse of J.H. when fashioning an appropriate sentence.

**B.  The Defense's Objections to Information Related to Jones's Possession of Child Pornography and Other Relevant Conduct**

Jones objects to the PSR's inclusion of information related to the child pornography found on a hard drive in Jones's house and certain relevant conduct that was not included in the Plea Agreement.  The information related to Jones's possession of child pornography is properly included in the PSR for the same reason as the information regarding the sexual abuse of J.H. should be.  Though the child pornography is not "relevant conduct" for purposes of calculating the Guidelines in this case, it is necessary for the Court to consider when devising a sentence that accounts for, among other things, "the nature and circumstances of the offense and the history and characteristics of the defendant."  *See* 18 U.S.C. § 3553(a)(1); 18 U.S.C. § 3661.  The PSR's discussion of Jones's possession of child pornography should therefore remain in the PSR and be considered by the Court.

The other information in the PSR to which the defense objects—that Jones threatened to "beat J.L.'s ass" and punched her, additional information regarding his abuse of R.C., and his intimidation and verbal abuse of the other prisoners—is also properly in the PSR and should be considered by the Court.  Not only is this information relevant to the Court's evaluation of the § 3553 factors, but unlike the child

1   pornography, it actually is "relevant conduct" under the Guidelines.  *See* U.S.S.G. § 1B1.3(a)(1)(A)

2   (defining "relevant conduct" as all acts and omissions committed, aided, abetted, counseled, commanded,

3   induced, procured, or willfully caused by the defendant . . . that occurred during the commission of the

4   offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or

5   responsibility for that offense.").  As discussed above, the environment of fear and intimidation that Jones

6   created in the kitchen was an integral part of his sexual abuse of C.V., J.L., and R.C. because it made the

7   prisoners more submissive than they already were given the inherent power imbalance and deterred them

8   from reporting his abuse.  It is thus "relevant conduct" that should be included in the PSR.

9        The information also bears more than a minimal indicum of reliability.  With respect to Jones's

10  physical assault of J.L. and his threat to "beat [her] ass," the facts Jones admitted to in the Plea Agreement

11  regarding his grooming and sexual abuse of J.L. are entirely consistent with the grooming and sexual

12  abuse J.L. described in her statement to agents.  Paulson Decl., Exs. 2 & 3.  The Plea Agreement therefore

13  corroborates J.L.'s statement and confirms her veracity.  It makes no sense that J.L. told the truth only

14  about the grooming and sexual abuse that Jones admitted to in the Plea Agreement, but then lied about

15  everything else.  The reality is that J.L. truthfully recounted what Jones had done to her—the grooming,

16  the sexual abuse, the verbal abuse, the physical abuse, and the threats—and there is no evidence to

17  contradict her account.

18       The information provided by inmate L.C. is similarly reliable.  She told agents that she frequently

19  saw Jones and R.C. together alone in the officer's office in the kitchen with the lights off, and that on

20  multiple occasions Jones told L.C. to serve as a lookout when he was in the back of the kitchen with R.C.

21  PSR ¶ 19.  These facts simply corroborate and provide additional details about the acts Jones already

22  admitted to committing in the Plea Agreement.  Plea Agreement ¶ 2(h)-(k).  And Jones has offered nothing

23  to contradict this information or question its veracity.

24       The same is true of information related to Jones's verbal abuse and intimidation of the prisoners

25  under his control in the kitchen.  Multiple prisoners reported that Jones regularly demeaned them and

26  called them names such as "snitch bitches," "crackheads," and "base head bitches."  Numerous others told

27  agents that Jones frequently talked about his penis.  These accounts corroborate one another and are

28  therefore properly included in the PSR and should be considered by the Court.  *See Franklin*, 18 F.4th at

1127 (hearsay statements that corroborate each other are sufficiently reliable to be admissible at sentencing).

Finally, mere denials of these facts are insufficient to carry Jones's burden of showing these statements are unreliable. *United States v. Reyes*, 772 F.3d 1152, 1160 n.7 (9th Cir. 2014) (assertion that declarant could lie for a "wide variety of reasons" not sufficient to "demonstrate that this [hearsay] evidence was false or unreliable" for purposes of sentencing). In any event, even if Jones did provide a self-serving declaration, he cannot be trusted. In this very case, he pleaded guilty to lying about his sexual abuse of the prisoners under his control. *See* Plea Agreement ¶ 2(m).

In short, the Court has broad discretion to consider a wide range of information that is relevant to the Guidelines calculation in this case and to the § 3553(a) factors, so long as that information has minimal indicum of reliability. The information provided to the Court regarding Jones's sexual abuse of J.H., and the information already contained in the PSR regarding Jones's possession of child pornography and other abusive conduct towards the prisoners, is reliable and should be considered.

## V.   SENTENCING RECOMMENDATION

### A.  Legal Standard

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the Guidelines. *Id*. After determining the appropriate Guidelines calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in § 3553(a). *Carty*, 520 F.3d at 991–93.

A defendant should be sentenced within the advisory sentencing Guidelines range unless "the court finds that there exists an aggravating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines that should result in a sentence greater than that described." 18 U.S.C. § 3553(b)(2)(A)(i). Additionally, U.S.S.G. § 5K2.0(a)(1)(B) provides for upward departures "in the case of child crimes and sexual offenses, [where] the court finds, pursuant to 18 U.S.C. § 3553(b)(2)(A)(i), that there exists an aggravating circumstance, of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the

Guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described."

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3)     the need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

(5)     the need to provide restitution to any victims of the offense.

**B.  The Government's Recommended Sentence of 96 Months is Sufficient but not Greater than Necessary**

The seriousness of the offense, the history and characteristics of the defendant, the need for specific and general deterrence, and the need to avoid sentencing disparities all support a 96-month custodial sentence in this case.

**1.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

The seriousness of Jones's offenses cannot be overstated.  The power imbalance between the women imprisoned in FCI Dublin and guards such as Jones could not be greater.  Jones used that power to repeatedly sexually abuse the vulnerable women he was supposed to protect—women who could not legally consent and who were not free to leave.  But for Jones, the inherently coercive nature of the guard-prisoner relationship was insufficient.  He also cultivated an environment of fear and intimidation, with words and with force.  He demeaned the prisoners, calling them "base head bitches," "snitch bitches," and "crackheads," among other things.  He threatened the prisoners, telling one that he would "beat [her] ass"

//

//

and another that he would "slap the shit out of [her]." He used force against the prisoners, punching J.L. in the chest and pushing R.C., who witnessed the assault.

He not only broke these prisoners down with insults and aggression, but he also groomed them with compliments and flattery. With J.L., for example, Jones threatened to "beat [her] ass" and assaulted her, but he also flirted with her and made comments about her butt. For the women confined inside FCI Dublin, many of whom came from broken homes and were themselves battling their own personal demons, this combination of mistreatment and praise left them feeling confused and with no option to resist Jones's sexual advances. As C.V. stated, she did not know what would happen to her if she refused to give Jones oral sex and she did not want to say no to Jones because he would treat her and the other prisoners worse on the days he did not sexually abuse C.V. J.L. similarly described how she felt there was never an opportunity to say no to Jones. Jones took advantage of this and used the women under his control for his own sexual gratification.

One of the more remarkable aspects of Jones's predation is how quickly it began. He started at FCI Dublin on May 24, 2020, and began sexually abusing C.V. sometime in early- to mid-July, a little over a month later. For about the next year, Jones sexually abused one prisoner after another. At first it was C.V. Nearly every day C.V. worked in the kitchen from July to December 2020, Jones used her for his own sexual pleasure, having oral and vaginal sex with her on multiple occasions and in multiple locations. When he got tired of abusing C.V., Jones moved on to J.L. Between March and June 2021, Jones sexually abused J.L., touching and sucking on her breasts on one occasion and having oral and vaginal sex with J.L. on another. At the same time he was abusing J.L., Jones also began abusing R.C. Between approximately March and June 2021, Jones received oral sex from R.C. and had vaginal sex with her on numerous occasions. When he was done with R.C., Jones moved on to J.H. In late 2021, Jones had sexual intercourse with her.

The sexual interactions to which he subjected these women were consistent with the demeaning and degrading way he treated the prisoners outside of the rooms in which he was sexually abusing them. With C.V. and J.L., for example, Jones instructed them to turn around so he could have sex with them from behind. Then when he was done, he had them get on their knees (sometimes in a bathroom) and give him oral sex as he stood over them and ejaculated into their mouths before cleaning himself off and

Case 4:23-cr-00212-YGR   Document 20   Filed 11/08/23   Page 22 of 26

leaving the room.  The degrading way in which Jones sexually abused these prisoners is further evidence that he viewed these prisoners as nothing more than objects to gratify his own sexual desires.

And when he was not sexually abusing women at FCI Dublin over whom he had power, he was cultivating a collection of images and videos of others sexually abusing equally powerless children.  On a hard drive in Jones's house, agents found dozens of images and videos of child pornography depicting the sexual abuse of children who, like the women Jones abused at work, could not legally consent to the sex acts they were forced to endure.

### 2.  The Need for the Punishment to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

As detailed above, the severity of Jones's crimes cannot be overstated, and demands a meaningful sentence.  He took an oath to uphold the Constitution and fulfill his duty as a public servant, and in doing so was entrusted by the federal government with immense power over the lives of the female prisoners confined inside FCI Dublin's walls.  Jones repeatedly violated that oath when he used his power to abuse victim after victim under his care and protection and lied about it to federal agents.  Courts have held that offenses committed by law enforcement should be taken particularly seriously due to their position of authority.  *See United States v. Herbert*, 813 F.3d 551, 563 (5th Cir. 2015) (affirming an upward variance in the sentencing of a defendant-officer based on the district court's finding that the defendant abused his position of trust); *United States v. Thames*, 214 F.3d 608, 614 (5th Cir. 2000) ("A defendant's status as a law enforcement officer is often times more akin to an aggravating as opposed to a mitigating sentencing factor, as criminal conduct by [law enforcement] constitutes an abuse of a public position.").  That is especially true here, where the yawning power differential between Jones and his victims left them helpless to resist.  A sentence well above the Guidelines advisory range is thus appropriate.

### 3.  The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct

A significant custodial sentence is necessary not only to deter Jones from ever again engaging in such a systematic and brazen abuse of power, but also to send a message to other guards that such abuse will result in a significant custodial sentence.  To date, three FCI Dublin guards have been sentenced by courts in this district for sexually abusing inmates.  The former warden received 70 months, the chaplain received 84, and a fellow cook with whom Jones worked received 20.  *See United States v. Ray Garcia*,

Case No. 4:21-cr-00429-YGR; *United States v. James Highhouse*, Case No. 4:22-cr-00016-HSG; *United States v. Enrique Chavez*, Case No. 4:22-cr-00104-YGR.  Three other guards are awaiting sentencing, and the government has indicted another.  *See United States v. John Bellhouse*, Case No. 4:22-cr-00066-YGR (awaiting sentencing following conviction at trial); *United States v. Ross Klinger*, Case No. 4:22-cr-00031-YGR (awaiting sentencing following guilty plea); *United States v. Nakie Nunley*, Case No. 4:23-cr-00213-YGR (awaiting sentencing following guilty plea); *United States v. Darrell Smith (a/k/a "Dirty Dick Smith")*, Case No. 4:23-cr-00110-YGR (charges pending).

Despite these cases and these sentences, the sexual abuse at FCI Dublin continued.  The government has received multiple, credible allegations of sexual abuse at FCI Dublin involving conduct that post-dates the charging and/or sentencing of these defendants.  Unfortunately, the sentences to date have not achieved the intended deterrent effect.  For far too long, Jones and other prison guards like him have abused the imprisoned women at FCI Dublin with impunity, believing they could use their power to deter their victims from coming forward, sometimes—as in this case—with threats, intimidation, and violence.  The sentence in this case must send a message not just to Jones, but to every prison guard at FCI Dublin and throughout the Bureau of Prisons, that if they betray the oaths they took as public servants by using their power to prey upon some of society's most vulnerable women—women who cannot say no, women who are literally the prisoners of their abusers—then significant consequences will follow.  A 96-month sentence is required here to send that message.

### 4.   The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants

As discussed above, three FCI Dublin guards have been sentenced for sexually abusing female prisoners under their control.  All of them have received above-Guidelines sentences—a result that is consistent with what courts in other districts have done.  *See United States v. Hosea Lee*, 5:21-cr-00084-DCR-MAS (E.D. Ky, August 1, 2022) (imposing an 80-month sentence on a BOP corrections officers who abused four victims where advisory Guidelines range was 18-24 months); *United States v. Grimes*, 18-cr-00069 (S.D. W. Va., Jan. 2019) (imposing sentence of 120 months in prison where advisory Guidelines range was 27-33 months in prison for abuse of multiple victims); *United States v. Mullings*, 15-cr-00538 (E.D.N.Y., May 13, 2016) (imposing sentence of 84 months where advisory Guidelines range

1   was 12-18 months).  Though all these cases present similar abuses of power, the facts here are unique and

2   warrant the 96-month sentence the government recommends.

3        None of the cases to date in this district involved the same level of coercive abuse with the same

4   quantity of victims over such an extended period as in this case.  Both Chavez and Highhouse pleaded

5   guilty to charges related to their sexual abuse of one prisoner each.  Jones pleaded guilty to sexually

6   abusing three, and there is evidence that he abused a fourth, J.H.  Though Garcia was also found guilty of

7   sexually abusing three prisoners and then lying about it, just like Jones, there are important differences

8   that set this case apart.  For starters, the nature of the sexual acts is different.  Garcia was convicted of

9   digitally penetrating one victim's vagina on multiple occasions and engaging in abusive sexual contacts

10  with that same victim and two others on multiple occasions.  Here, Jones admitting to repeatedly having

11  oral sex and vaginal intercourse with three victims over the course of more than a year.  Moreover, as

12  discussed above, the degrading way he engaged in these sex acts with the victims—instructing them to

13  turn around and bend over so he could penetrate them from behind, ordering them to kneel on the bathroom

14  floor and give him oral sex, and ejaculating in their mouths, among other things—sets this case apart.  And

15  although both Garcia and Jones used the coercive powers inherent in their respective positions to

16  manipulate and abuse women they were supposed to protect, Jones also used force, threats, and verbal and

17  physical abuse to sow fear among the prisoners, thus rendering the already powerless women even more

18  vulnerable to his sexual predation.  This coercive and abusive environment was exacerbated by the fact

19  that, as their boss, Jones had daily, prolonged control over his victims.

20       One other key difference between Jones and Garcia is that Jones has pleaded guilty and taken

21  responsibility for his sexual abuse of three victims.  The government's recommended sentence here

22  accounts for that.  In the Garcia case, which involved a trial during which Garcia perjured himself on the

23  stand over the course of multiple days of testimony, the government recommended 180 months.  Here, in

24  recognition that Jones has actually taken responsibility for his sexual abuse of C.V., J.L., and R.C., the

25  government believes that 96 months—a little more than half of what the government recommended for

26  Garcia—is the appropriate sentence for Jones.

27  **VI.    CONCLUSION**

28       For the foregoing reasons, the United States recommends that the Court sentence Jones to 96

months' imprisonment, 10 years' supervised release, and a $30,700 special assessment.

DATED:  November 8, 2023                                    Respectfully submitted,

                                                           ISMAIL J. RAMSEY
                                                           United States Attorney

                                                           */s/ Andrew Paulson*
                                                           ANDREW PAULSON
                                                           MOLLY K. PRIEDEMAN
                                                           Assistant United States Attorneys

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**APPENDIX A**

| Counts 1-6: Sexual Abuse of a Ward – 18 U.S.C. § 2243(b) Count 7: False Statements to Government Agency – 18 U.S.C. § 1001(a)(2) | | |
|---|---|---|
| | **U.S.S.G. Section** | **Level/Points[13]** |
| **Group 1 (Counts 1 & 7) – Sexual Abuse of a Ward (C.V.) + False Statements[13]** | | |
| Base offense level | § 2J1.2 | 14 |
| Specific Offense Characteristics: <br> - False statements related to sex offense | § 2J1.2(b)(1) | +4 |
| **Adjusted Offense Level** | | **18** |
| **Group 2 (Count 2) – Sexual Abuse of a Ward (C.V.)** | | |
| Base offense level | § 2A3.3 | 14 |
| **Adjusted Offense Level** | | **14** |
| **Group 3 (Count 3) – Sexual Abuse of a Ward (C.V.)** | | |
| Base offense level | § 2A3.3 | 14 |
| **Adjusted Offense Level** | | **14** |
| **Group 4 (Count 4) – Sexual Abuse of a Ward (J.L.)** | | |
| Base offense level | § 2A3.3 | 14 |
| **Adjusted Offense Level** | | **14** |
| **Group 5 (Count 5) – Sexual Abuse of a Ward (R.C.)** | | |
| Base offense level | § 2A3.3 | 14 |
| **Adjusted Offense Level** | | **14** |
| **Group 6 (Count 6) – Sexual Abuse of a Ward (R.C.)** | | |
| Base offense level | § 2A3.3 | 14 |
| **Adjusted Offense Level** | | **14** |
| **Multiple Counts** | | |
| Greatest Offense Level | | 18 |
| Number of Units | § 3D1.4 | 6 |
| Increase in Offense Level | § 3D1.4 | +5 |
| Acceptance of Responsibility | § 3E1.1 | -3 |
| **Total Offense Level** | | **20** |
| **Guidelines Range (CHC I)** | | **33-41 months** |

---

[13] These are grouped pursuant to § 3D1.2(c).  *See* § 3C1.1 (Obstruction and Related Adjustments), Application Note 8 (if defendant convicted of obstruction offense and an offense to which the obstructive conduct occurred, group two counts and use highest of obstruction offense or two-level enhancement on underlying offense).