GALIA Z. AMRAM (CA SBN 250551)
GAmram@mofo.com
RAMSEY W. FISHER (CA SBN 334228)
RamseyFisher@mofo.com
MORRISON & FOERSTER LLP
425 Market Street,
San Francisco, California  94105-2482
Telephone:    415.268.7000
Facsimile:     415.268.7522

Attorneys for Defendant
ANDREW JONES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>       v.<br><br>ANDREW JONES,<br><br>                    Defendant. | Case No. 4:23-CR-00212-YGR<br><br>**DEFENDANT ANDREW JONES'S SENTENCING MEMORANDUM** |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................................. 1
II. BACKGROUND .................................................................................................................. 1
    A. A Difficult Childhood .................................................................................................. 1
    B. Military Service and Early Adulthood ........................................................................ 3
    C. Struggle with Substance Abuse ................................................................................... 4
    D. The Offending Conduct ............................................................................................... 5
    E. Commitment to Reform ............................................................................................... 6
III. DETERMINING THE APPROPRIATE SENTENCE ...................................................... 6
    A. The Correct Guideline Calculation .............................................................................. 6
    B. Section 3553 Factors ................................................................................................. 11
        1. Nature and Circumstances of the Offense and History and Characteristics of the Defendant ................................................................................................................. 11
        2. The Need for the Sentence Imposed ..................................................................... 13
        3. The Sentencing Range as Calculated in the Sentencing Guidelines and the Need to Avoid Unwanted Sentence Disparities .................................................................. 14
        4. The Need to Provide Restitution ........................................................................... 15
    C. The Appropriate Sentence ......................................................................................... 15
IV. MR. JONES SHOULD NOT BE REMANDED AT SENTENCING ............................. 15
V. CONCLUSION .................................................................................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Conception v. United States*,
   142 S. Ct. 2389 (2022) .................................................................................................. 16

*Gall v. United States*,
   128 S. Ct. 586 (2007) .................................................................................................... 11

*Koon v. United States*,
   518 U.S. 81 (1996) ........................................................................................................ 14

*Pepper v. United States*,
   131 S. Ct. 1229 (2011) .................................................................................................. 11

*U.S. v. Garcia*,
   No. 21-CR-00429, United States' Sentencing Memorandum ............................... *passim*

*United States v. Booker*,
   543 U.S. 220 (2005) ...................................................................................................... 14

*United States v. Carty*,
   520 F.3d 984 (9th Cir. 2008) ........................................................................................ 11

*United States. v. Faulkner*,
   952 F.2d 1066 (9th Cir. 1991) ...................................................................................... 12

*United States. v. Franklin*,
   18 F.4th 1105 (9th Cir. 2021) ......................................................................................... 8

*United States v. Howe*,
   543 F.3d 128 (3d Cir. 2008) ......................................................................................... 13

*United States v. Smith*,
   387 F.3d 826 (9th Cir. 2004) ........................................................................................ 13

*United States v. Volpe*,
   78 F. Supp. 2d 76 (E.D.N.Y.1999) ............................................................................... 14

*United States v. Weston*,
   448 F.2d 626 (9th Cir. 1971) .......................................................................................... 8

**Statutes**

18 U.S.C. § 3143 ................................................................................................................ 16

18 U.S.C. § 3553(a) ........................................................................................................... 11

18 U.S.C. § 3553(a)(2)-(D) .................................................................................................. 13

18 U.S.C. § 3553(a)-(5)(7) .................................................................................................. 11

18 U.S.C. § 3553(a)(6) ........................................................................................................ 14

U.S.S.G. Ch.1, Pt. A, Intro. Comment 4(b) ....................................................................... 12

U.S.S.G. § 3D1.4 .......................................................................................................... 6, 10

U.S.S.G § 3E1.1(a) .............................................................................................................. 11

U.S.S.G. § 3E1.1(b) ............................................................................................................. 11

U.S.S.G. § 4C1.1(a) ......................................................................................................... 7, 10

U.S.S.G § 5K2.20(a) ........................................................................................................... 13

## I.   INTRODUCTION

Andrew Jones is only thirty-six years old, but his life has been marked by trauma. He was raised by a single mother. His father was abusive. He served our country in the United States Army as a correctional officer in Guantanamo Bay. He left with a 100% service-connected disability for a host of ailments including PTSD. In a three-year span, he suffered the loss of all four of his childhood friends. He has struggled with a gripping dependency on alcohol, including during the time of his offenses. Yet for nearly eight years, he served as a correctional officer without a single issue. This is not a case about a longtime sexual offender. We are here because, over the course of a single year, Mr. Jones lost his way and behaved horribly, committing actions he will regret for the rest of his life.

Mr. Jones has owned up to those actions. He cooperated with the government's investigation, proffered twice, waived an indictment, and pled guilty. He has complied with every condition of his pretrial release. He is a father to young children, is receiving mental health and substance abuse treatment, and has concrete goals for the future.

Probation's sentencing recommendation of 96 months is disproportionate and unwarranted based on the factual basis before the Court. It is nearly *triple* the high-end of the guideline range. It is significantly higher than the sentence for similarly situated defendants, including most notably Ray Garcia—the most powerful person at FCI Dublin who, as the government argued, "created and perpetuated a culture of abuse." *U.S. v. Garcia*, No. 21-CR-00429, United States' Sentencing Memorandum and Motion for Upward Departure or Upward Variance, at 6. And it appears to be predicated on unreliable and untested testimony collected months after the plea was entered from witnesses with conflicting motivations. Departing from the guidelines in this case will not serve the goals of sentencing. The Court should impose a sentence in the middle of the guideline range.

## II.   BACKGROUND

### A.   A Difficult Childhood

Andrew Jones was born in Okinawa, Japan in July 1987. Presentence Investigation

1  Report ("PSR") at ¶ 82. His father was in the United States Air Force. *Id.* at ¶ 83. He is the
2  second youngest of five siblings. *Id.* The family resided in Okinawa for the first year of Mr.
3  Jones's life before relocating to Auburn, New York. *Id.* at ¶ 82.

4      Unfortunately, the family began to fall apart. Mr. Jones's father chronically abused Mr.
5  Jones's mother. The two eventually divorced as a result. *Id.* at ¶ 84. The abuse reached Mr.
6  Jones and his siblings, too. *Id.* Mr. Jones remembers the abuse was common any time he and his
7  siblings were around his father. *Id.* On one occasion, his father ripped an earring out of Mr.
8  Jones's brother's ear. *Id.* Mr. Jones remembers seeing his brother's blood spill everywhere. *Id.*
9  On another, his father slammed Mr. Jones's and his sister's head together like two coconuts. *Id.*
10 On one morning, Mr. Jones remembers that his sister's face was so swollen from abuse that she
11 had to stay home from school. *Id.* They never reported his father to Child Protective Services.
12 *Id.*

13     Mr. Jones was particularly close to his eldest sister, Lydia. Mr. Jones's mother worked
14 long hours to support the family. *Id.* At ¶ 85. As a result, Lydia became a maternal figure for Mr.
15 Jones. *Id.* When he was seven years-old, however, Lydia started having health problems. *Id.*
16 She was diagnosed with type 1 diabetes and kidney failure. *Id.* More than once, Mr. Jones
17 walked into a room to find Lydia unconscious on the floor, sending him into a panic to call 911
18 and frantically try to wake her up while he waited for help. Lydia's health did not improve for
19 years.

20     Mr. Jones was a latch-key kid. While his basic needs were met, he did not receive
21 emotional support or help coping with his father's abuse. Understandably, Mr. Jones did not have
22 a relationship with his father. *Id.* at ¶ 84. The two rarely speak. His relationship with his mother
23 has never been meaningful. Her work schedule impeded her ability to play a meaningful role in
24 Mr. Jones's life as a child. Today, they speak only infrequently. While the siblings were close in
25 early age, they grew apart as they became teenagers and young adults.

26     As a result, as a young teenager, Mr. Jones derived support largely from his four
27 childhood friends: Nick, Vince, Chris Cooper, and Chris Socci. *Id.* at ¶ 86. He also had a
28

DEFENDANT ANDREW JONES'S
SENTENCING MEMORANDUM      2
CASE NO. 4:23-CR-00212-YGR

1  girlfriend, Kelly Unger.  When he was fifteen, they conceived a child, Layla.  *Id.* at ¶ 87.  Mr.
2  Jones and Ms. Unger stayed together for four years, until Mr. Jones left for the army and the two
3  grew apart.  *Id.* at ¶¶ 87-88.  Mr. Jones has maintained a relationship with Layla to this day.  *Id.* at
4  ¶ 87.

### B. Military Service and Early Adulthood

6  Mr. Jones's early adulthood was challenging.  In July 2007, Mr. Jones joined the United
7  States Army.  *Id.* at ¶ 88.  There, he met Frances Alderete.  *Id.*  The two married in December
8  2007.  *Id.*  Their marriage ultimately proved to be a source of pain.  Ms. Alderete was deployed to
9  Iraq in 2008.  *Id.*  Shortly thereafter, Mr. Jones received a report that she had been raped.  *Id.*  He
10 was denied clearance to go to Iraq.  *Id.*  He later learned that, in truth, she had developed an
11 addiction to methamphetamine and was unfaithful.  *Id.*  Mr. Jones filed for divorce.  *Id.*  Due to
12 military restrictions, it was not granted until 2011.  *Id.*

13 In 2009, while his divorce with Ms. Alderete was pending, Mr. Jones was deployed to
14 Guantanamo Bay.  *Id.* at ¶ 89.  The work took an unimaginable toll.  Mr. Jones performed 50 to
15 60 forced feedings per day on detainees.  *Id.* at ¶ 95.  He observed interrogation rooms.  *Id.*  He
16 was frequently attacked by detainees requiring medical attention.  *Id.*  Detainees threw feces at
17 him.  *Id.*  Detainees yelled at him.  Stress and fear were constant.  Mr. Jones was honorably
18 discharged in 2010 and has since been diagnosed with a 100% service-connected disability for a
19 host of ailments including PTSD.

20 This time in Mr. Jones's life was also traumatic on a personal front.  In a three-year span
21 between 2009 and 2012, he lost all four of his childhood friends.  *Id.* at ¶ 86.  While at
22 Guantanamo Bay in 2009, he received word that Nick had passed away from Leukemia.  *Id.*
23 Vince committed suicide not long after that in 2010.  *Id.*  In 2011, he learned that Chris Cooper
24 died of an overdose.  *Id.*  Chris Socci died of the same a year later in 2012.  *Id.*

25 Mr. Jones started his career at the Bureau of Prisons in the wake of those losses in 2012.
26 He believes his mental health got progressively worse during this time.  *Id.* at ¶ 95.  The prisons
27 were understaffed, and the work environments were toxic.  *Id.*  He relocated every two years

hoping the next place would be better. *Id.* It never was. *Id.* The negative morale existed everywhere. *Id.*

Perhaps the only ray of positivity in Mr. Jones's life at the time was his marriage to his wife, Amie Jones. He and Ms. Jones met at Guantanamo Bay. *Id.* at ¶ 89. As she explains:

> Andrew and I were inseparable. He took on the role of a provider and protector. I unveiled a soft version of Andrew, a side that was only known to me. This is the man who comforted me when I couldn't make it home for the passing of my Grandfather. This is the man who helped me turn away from a lifestyle of being used and abused. He rescued me off the path of addiction. He inspired me to want to be a good woman, future wife and mother.

Fisher Decl. Ex. A at 1. The two married in October 2015 in Ann Arbor, Michigan. They started a family in Cleveland, Ohio, with three children. Xavian Jones is now 12. PSR at ¶ 89. Carter Jones is 9. *Id.* Lexi Jones is 6. *Id.* All children are in good health and have a good relationship with both parents. *Id.*

Unfortunately, two years in, the marriage started having problems. Ms. Jones's mental health took a negative turn. *Id.* at ¶ 90. She was diagnosed with PTSD, anxiety, depression, and bipolar II disorder. *Id.* Mr. Jones continued to struggle with his own PTSD and the stress of working in the Bureau of Prisons. They were in "a constant state of anger." Fisher Decl. Ex. A at 1. Mr. Jones was relocated to a facility in Fresno in 2019. *Id.*; PSR, at ¶ 90. He traveled back and forth to Ohio to see Ms. Jones and the children as much as he could. PSR, at ¶ 90. That stopped with the onset of the pandemic in March 2020. *Id.* The distance and preexisting anger ultimately led Ms. Jones to file for divorce. Fisher Decl. Ex. A at 1. The divorce became final in July 2020, *id*, two months after Mr. Jones started at Federal Correctional Institution, Dublin ("FCI Dublin"), PSR at ¶ 7.

C. **Struggle with Substance Abuse**

Mr. Jones's divorce with Ms. Jones exacerbated his already poor mental health. He was living alone. Fisher Decl. Ex. A at 1. He lacked a network of support. He was away from his family. *Id.* All of his friends had died. He did not have a relationship with his siblings or his parents. He was not receiving any form of mental health treatment for his PTSD. Ms. Jones

DEFENDANT ANDREW JONES'S
SENTENCING MEMORANDUM                                                                                                     4
CASE NO. 4:23-CR-00212-YGR

believes the divorce "compromised his ability to cope with life." *Id.* He turned to alcohol as a result. His dependency on alcohol started when he was 24, , just after Chris Cooper died. PSR at ¶ 96. His addiction intensified over the next five years. *Id.* He was able to control it for a time between 2017 and 2020, but his addiction roared back after the divorce. He started consuming alcohol excessively. He went to work after drinking heavily. *Id.* His addiction severely compromised his judgment.

### D. The Offending Conduct

During the time that he was drinking and coping with his divorce and PTSD, Mr. Jones committed the offenses that bring him before this Court. Mr. Jones voluntarily cooperated with the government's investigation into that conduct. He spoke to them once without counsel. He spoke to them twice with counsel and agreed to a pre-Indictment resolution.[1] The government filed a seven-count information on July 13, 2023. On August 17, 2023, Mr. Jones pled guilty to all seven counts.

The factual basis in that plea is substantially narrower than the facts included in the PSR. The facts agreed to by both Mr. Jones and the government cover a defined set of sexual acts occurring between July 1, 2020 and June 30, 2021 with three women: C.V., J.L., and R.C. There is nothing in the plea agreement suggesting any of those acts were forcible or occurred under threat of violence. There is nothing in the plea agreement about Mr. Jones being disrespectful and cursing at inmates. And there is certainly nothing in the plea agreement about Mr. Jones possessing child pornography.

In March 2022, Mr. Jones was sent home from work. A few weeks later, the FBI stormed the Jones's apartment around 6:00 AM. Fisher Decl. Ex. A at 2. It was a chaotic and traumatic experience. *Id.* Mr. Jones was placed in handcuffs. *Id.* His kids woke up to the sound of agents giving commands and busting into rooms. *Id.* Mr. Jones remained cooperative and was escorted to the police station for questioning. *Id.* He did not have counsel. Out of fear, he lied about whether he had sexual relations with C.V.

---

[1] The PSR indicates that the undersigned is retained. PSR at p.1. That is incorrect. The undersigned was appointed through the CJA Panel in August 2022.

DEFENDANT ANDREW JONES'S
SENTENCING MEMORANDUM                                                                 5
CASE NO. 4:23-CR-00212-YGR

### E. Commitment to Reform

Mr. Jones deeply regrets the actions he took between July 1, 2020 and June 30, 2021, and his decision to be untruthful to agents when he was initially questioned in March 2022. This has been a particularly dark period in his life. But he is committed to reform. First and foremost, he got sober again. This time, he looks forward to getting treatment to ensure he does not turn back to his addiction. He also tried to reconcile his relationship with Ms. Jones. He succeeded. In August 2021, Ms. Jones moved to California so the family could be reunited. Fisher Decl. Ex. A at 1. Mr. Jones started looking for jobs outside the Bureau. *Id.* Mr. Jones told Ms. Jones about why he was sent home from work. *Id.* at 2. She describes them having "the most honest conversations [they] ever had." They officially remarried in late March 2022. *Id.* Shortly after, Mr. Jones enrolled in and completed a program to become a certified personal trainer in hopes of developing skills he could use to secure employment after incarceration. *Id.* Indeed, as Ms. Jones explains:

> During Andrew's time away from the BOP, we have continued to work on ourselves individually, and as a couple. Regardless of the challenges that lay ahead, we have never been so close or happy as a family. Andrew is the backbone in our family. I am who I am because of him...Through so many ups and downs over the last 14 years and what we are facing today, Andrew has never turned his back on me or his children…I believe Andrew has every intention of improving…I have no doubt that Andrew will make the most out of counseling or programs offered to him. Andrew has shown a steadfast demeanor in moving past his mistakes in a constructive and successful manner.

*Id.*

### III. DETERMINING THE APPROPRIATE SENTENCE

#### A. The Correct Guideline Calculation

Mr. Jones disagrees with Probation's calculation of his base offense level. Mr. Jones agrees that the Combined Adjusted Offense Level for all counts under the table in U.S.S.G § 3D1.4 is 23. He also agrees with Probation's criminal history score of zero, and Probation's application of a three-point decrease for his demonstrated acceptance of responsibility. He disagrees, however, with Probation's determination that the two-point reduction for zero-point

offenders should not apply here.  As a result, Mr. Jones contends the proper base offense level is **18**, not **20** as Probation calculates in the PSR.  The correct guideline range is thus **27 months to 33 months**, not **33 months to 41 months** as Probation calculates.

The Amendments to the US Sentencing Guidelines include two-point reduction for defendants who meet certain criteria, one of which is whether the defendant used "violence or credible threats of violence in connection with the offense."  USSG § 4C1.1(a)(2)-(a)(10).  Probation notes that this reduction is not applicable because "the defendant used violence and credible threats of violence in connection with the offense against J.L."  PSR at p. 25.  There is no evidence of that.

The plea agreement contains the following facts about Mr. Jones's relations with J.L.:

- They began working in the kitchen together in November 2020.
- Mr. Jones flirted with her.
- On a date between approximately March 1, 2021, and May 31, 2021, they entered the butcher freezer in the kitchen, Mr. Jones approached J.L., lifted her shirt, touched J.L.'s breasts and sucked on her breasts.
- On a date between approximately January 1, 2021, and June 30, 2021, Mr. Jones escorted J.L. into the food service warehouse, locked the door behind her, entered the warehouse through a different door, kissed J.L., and then had oral and vaginal sex with J.L.

ECF No. 10, at 4.  That's it.  It does not suggest that they ever had a sexual encounter because Mr. Jones used physical violence or the threat of physical violence.

Probation's conclusion appears to be based on information outside the factual basis that the government collected *after* the plea was entered.  Specifically, Probation appears to rely on a statement J.L. gave to the government on September 22, 2023, in which she claims that Mr. Jones threatened to "beat [J.L.'s] ass" and that, on one occasion before they had sex, Mr. Jones punched her in the chest.  PSR at ¶ 16.  This is unreliable hearsay that should not be considered at sentencing.

DEFENDANT ANDREW JONES'S
SENTENCING MEMORANDUM
CASE NO. 4:23-CR-00212-YGR

7

1   While hearsay is generally admissible in sentencing hearings, "'due process requires that some minimal indicia of reliability accompany a hearsay statement' introduced at sentencing." *United States. v. Franklin*, 18 F.4th 1105, 1114 (9th Cir. 2021) (citing *United States. v. Petty*, 982 F.2d 1365, 1369-70 (9th Cir. 1993)). Reliance on unreliable, materially false information at sentencing violates due process. *United States v. Weston*, 448 F.2d 626 (9th Cir. 1971).

The Ninth Circuit has developed a two-part disjunctive test for determining whether hearsay statements can be relied on at sentencing. Such statements must be either "procedurally reliable" or "substantively reliable." *Franklin*, 18 F.4th at 1124. When assessing procedural reliability, courts are to "ask whether there are sufficient procedural protections so that the defendant does not have to 'prove a negative' in the face of government allegations." *Id.* "Generally, if the government supports the hearsay statements with extrinsic evidence that the defendant can challenge on cross-examination," procedural reliability is found. *Id.* Substantive reliability, in contrast, depends on whether the source of the hearsay statement is from a "self-demonstrably reliable" source or corroborated by other hearsay statements. This is a fact question, requiring judgment as to "whether a statement is probably truthful in light of all the circumstances—that is, 'the application of the fact-finding tribunal's experience with the mainsprings of human conduct.'" *Id.* at 1125 (citing *United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009)).

Neither indicium of reliability exists here. First, the government has not indicated that it intends to call J.L. or any other witness that could corroborate her purported testimony that Mr. Jones threatened and punched her. There is no opportunity for Mr. Jones to cross-examine the hearsay statements. This is simply rank hearsay. There is no procedural reliability.

Second, J.L.'s statements are not presumptively reliable. Just the opposite. Her story is inconsistent. J.L. first spoke to the FBI on August 9, 2022. At that point, she did not make any suggestion that Mr. Jones performed sexual acts using violence or a threat of violence. On the contrary, she allegedly told the FBI that "she liked the attention" when Mr. Jones "started hitting on her and making comments about her butt." Fisher Decl. Ex. B, at 2. She said that Mr. Jones

ejaculated in her mouth. *Id.* at 3.  She also said that, after Mr. Jones discovered she had told other inmates about their relationship, he said that "he was thinking about beating her ass but then realized he probably just needed to brag about it…." *Id.*

The overall context of that statement is critical.  In August 2022, J.L.'s statement to the FBI indicated that she and Mr. Jones would frequently joke with each other.  She said Mr. Jones was "nice" to her. *Id.* at 2, 4.  She said that they would "horseplay," and that Mr. Jones would "playfully push [her]." *Id.*  He made flirtatious comments to her, and she made them right back. *Id.*  She did not say she was afraid of Mr. Jones, and she did not suggest that he ever "threatened" to beat her ass if she did not have sex with him.

She next spoke to the FBI over a year later, on September 22, 2023.  In that interview, the tone and substance of her statement completely changed.  She allegedly called Mr. Jones a "predator."  Fisher Decl. Ex. C, at 2.  She allegedly stated that on one occasion she and Mr. Jones were arguing in the kitchen and Mr. Jones "punched [her] chest, on her chest plate." *Id.*  She allegedly said that Mr. Jones was "scary," that this happened before they had sex, that she was "intimidated" by Mr. Jones, that Mr. Jones would "degrade" her and "made her feel that she needed" Mr. Jones. *Id.*  She said he ejaculated on her hand, not in her mouth. *Id.*  And she said that Mr. Jones "would threaten to 'beat [her] ass'" and that she was afraid of him because of it. *Id.*

Consider the timing of J.L.'s second interview.  It occurred a year after her first interview, two years after the acts referenced in the factual basis, but just a  month after Mr. Jones's entered his guilty plea and J.L. filed a class-action lawsuit in this Court against Mr. Jones and the Bureau of Prisons.  See, *California Coalition for Women Prisoners; R.B.; A.H.R.; S.L.; J.L.; J.M.; G.M.; A.S.; and L.T. v. United States of America Federal Bureau of Prisons, et al.*, No. 4:23-cv-04155-YGR, Complaint (filed August 16, 2023).  It is worth noting that the complaint alleges an entirely new incident of sexual misconduct that J.L. did not disclose to the FBI in either interview. *Id.* at ¶ 96 (alleging that, while in a walk-in fridge, Mr. Jones "grabbed [ ] J.L., bent her over, and rubbed his penis against her buttocks over their clothing.").  The lawsuit asks this Court, in part,

DEFENDANT ANDREW JONES'S
SENTENCING MEMORANDUM
CASE NO. 4:23-CR-00212-YGR

9

to order the BOP to create a process to assist victims like her with compassionate release petitions. *Id.* at ¶ 446. It appears one of the first things J.L. told the FBI in her September 22, 2023 interview is how she would like her family to be reunited and what she would do if granted compassionate release. Fisher Decl. Ex. C, at 1.

Mr. Jones in no way intends to disparage J.L. or trivialize her experience. His conduct was wrong. But the government has not met its burden of showing that it was done under threat of violence or threat of violence. J.L.'s hearsay statements are not sufficiently reliable for the Court to conclude otherwise. They should not be relied upon at sentencing. As a result, the proper guideline calculation is as follows:

| Group/Count | Adjusted Offense Level | Units |
|---|---|---|
| Count Group 1 | 18 | 1 |
| Count 2 | 14 | 1 |
| Count 3 | 14 | 1 |
| Count 4 | 14 | 1 |
| Count 5 | 14 | 1 |
| Count 6 | 14 | 1 |
| **Total Number of Units**: | | 6 |

**Greater of the Adjusted Offense Levels Above**: **18**

**Increase in Offense Level**: The offense level is increased pursuant to the number of units assigned by the amount indicated in the table at USSG §3D1.4. **+5**

**Combined Adjusted Offense Level**: The Combined Adjusted Offense Level is determined by taking the offense level applicable to the Group with the highest offense level and increasing the offense level by the amount indicated in the table at USSG §3D1.4. **23**

**Chapter Four Enhancement**: None.

**Chapter Four Reduction**: Mr. Jones has not received any criminal history points from Chapter Four, Part A, and meets the other criteria outlined in U.S.S.G § 4C1.1(a)(2) – (a)(10) (Adjustment for Certain Zero-Point Offenders). As such, the offense level is decreased by two levels. U.S.S.G.

§ 4C1.1(a).  **-2**

**Acceptance of Responsibility**:  Mr. Jones has clearly demonstrated acceptance of responsibility for the offense.  Accordingly, the offense level is decreased by two levels. U.S.S.G § 3E1.1(a). **-2**

**Acceptance of Responsibility**: Mr. Jones has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. U.S.S.G. § 3E1.1(b). **-1**

**Total Offense Level**: **18**

Based upon a total offense level of **18** and a criminal history category of I, the appropriate guideline imprisonment range is **27 months to 33 months**.

### B. Section 3553 Factors

The Supreme Court has emphasized the need for individualized sentencing based not only on the crime, but on the defendant's particular circumstances.  *See Pepper v. United States*, 131 S. Ct. 1229 (2011).  The Court must consider Mr. Jones as an individual.  *Gall v. United States*, 128 S. Ct. 586, 598 (2007) (*quoting Koon v. United States*, 518 U.S. 81, 113 (1996)).  Under 18 U.S.C. § 3553(a), the Court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) . . . ." *United States v. Carty*, 520 F.3d 984, 989 (9th Cir. 2008).

18 U.S.C. § 3553(a)-(5)(7) further directs sentencing courts to consider: the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed; the kinds of sentences available; the sentencing range as calculated in Sentencing Guidelines, Sentencing Guidelines policy statements, the need to avoid unwanted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.  None of those factors justify the variance recommended by Probation.

#### 1. Nature and Circumstances of the Offense and History and Characteristics of the Defendant

The guidelines are intended to "carv[e] out a 'heartland,' a set of typical cases embodying

the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct *significantly differs from the norm*, the court may consider whether a departure is warranted." U.S.S.G. Ch.1, Pt. A, Intro. Comment 4(b) (2023) (emphasis added).

There is nothing in the factual basis suggesting Mr. Jones's conduct falls outside of the heartland of conduct for typical cases involving sexual abuse of a ward. As noted above, the factual basis does not suggest the offense against J.L. was committed violently or under the threat of violence, and her recent statements suggesting otherwise are unreliable. The same is true of C.V. and R.C. The factual basis describes multiple instances of oral and vaginal sex between C.V., R.C., and Mr. Jones. ECF No. 10, at 3-5. It does not suggest that any of those instances occurred due to violence or under a threat of violence. Nor is there any indication in the factual basis that Mr. Jones was rude or disrespectful to the victims in this case.

Mr. Jones's conduct was wrong, but the Sentencing Commission has accounted for that. In fact, the November 2023 amendments to the Sentencing Guidelines ***increased*** the base offense level for offenses involving sexual abuse of a ward from 14 to 18 specifically in recognition that the prior level was too low:

> The Commission determined that the increased base offense level will more appropriately reflect the 15-year statutory maximum penalty for offenses referenced to this guideline and punish the serious sexual conduct involved in these offenses. In promulgating the amendment, the Commission was informed by both the rate and extent of above-range sentences in these cases. While the average guideline minimum in fiscal years 2018 through 2022 was 17 months (median 12 months), the average sentence imposed was more than double, at 35 months (median 15 months).

Amendments to the Sentencing Guidelines, Policy Statements, Official Commentary, and Statutory Index, at 23. There is no justification for deviating from the Guidelines here.[2]

---

[2] The PSR also notes a hard drive containing CSAM. PSR at ⁋ 22. It would be error to consider this fact in determining Mr. Jones's sentence. There is no evidence that Mr. Jones had any knowledge about what was on the hard drive. It contained over 1,600 video files and over 27,000 image files. *Id.* Only 31 met the definition of CSAM. *Id.* Mr. Jones was not charged with possession of child pornography; he should not be sentenced as if he were. *United States. v. Faulkner*, 952 F.2d 1066, 1069-70 (9th Cir. 1991) (considering discovery pertaining to uncharged offenses at sentencing "would undermine the integrity of the plea-bargaining system.").

DEFENDANT ANDREW JONES'S
SENTENCING MEMORANDUM                                                                                                12
CASE NO. 4:23-CR-00212-YGR

This is especially true considering the nature and personal characteristics of Mr. Jones. All of the offending conduct happened in the course of a single calendar year. A year in which he was reeling from a divorce and had no support network to lean on. A year in which he turned to alcohol to cope. A year following a difficult childhood and an early adulthood marked by trauma and loss. None of those circumstances excuse Mr. Jones's decisions. But they do help explain why a veteran and devoted father without a criminal record committed the offenses at issue here. That history, and Mr. Jones's cooperation with the government and commitment to reforming himself moving forward, cut against deviating from the guidelines. Indeed, if anything, they provide justification for a downward variance or departure. *See United States v. Smith*, 387 F.3d 826, 834–35 (9th Cir. 2004) (departure possible under U.S.S.G § 5K2.20(a) because the defendant had lived an exemplary life prior to the crime; section also permits departure for past employment record and record of prior good works); *United States v. Howe*, 543 F.3d 128, 138–40 (3d Cir. 2008) (affirming downward variance based on defendant's 20 years of military service, honorable discharge).

### 2.     The Need for the Sentence Imposed

Courts consider several statutory factors when determining the need for the sentence imposed. These include the need: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . ." 18 U.S.C. § 3553(a)(2)-(D).

There is no need to incarcerate Mr. Jones for 96 months. Probation commented that it hopes the sentence "deters [Mr. Jones] from engaging in future criminal conduct." PSR at p. 28. But there is no risk of Mr. Jones reoffending. He is never going to work in a prison again. He has no prior criminal history. And every indication is that Mr. Jones is devoted to reforming himself and becoming a productive member of society. Incarcerating him for 96 months is going to deter that progress, not his propensity to commit crimes in the future.

There is also a significant likelihood that the upward variances recommended by Probation or the government will result in Mr. Jones serving an isolated sentence in a remote institution far away from his family. Due to Mr. Jones's prior status as a BOP employee, knowledge of BOP policies and procedures, and offense conviction, Mr. Jones is likely to face a number of restrictions once incarcerated to protect him from violent retaliation from other inmates. That could include time in extended isolation, worsening his mental health. It could also mean designation at a remote BOP facility, taking him away from his family.

These circumstances underscore why Probation's recommendation is unnecessary. If anything, they too make Mr. Jones eligible for any number of downward departures or variances. *Koon v. United States*, 518 U.S. 81 (1996) (no abuse of discretion to grant downward departure to police officers convicted of civil rights violation due to their vulnerability in prison); *United States v. Volpe*, 78 F. Supp. 2d 76 (E.D.N.Y.1999) (two level departure granted due to extraordinary notoriety of the case and general opprobrium toward defendant combined with his status as a police officer which left him unusually susceptible to abuse and might require a lot of time in segregation).

### 3. The Sentencing Range as Calculated in the Sentencing Guidelines and the Need to Avoid Unwanted Sentence Disparities

"Congress' basic statutory goal—a system that diminishes sentencing disparity—depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the criminal conviction." *United States v. Booker*, 543 U.S. 220, 250 (2005) (emphasis in original). The Guidelines instructs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Probation's recommended sentence would create a stark sentencing disparity. As a general matter, the average sentence imposed for sexual abuse of a ward was 35 months. Amendments to the Sentencing Guidelines, Policy Statements, Official Commentary, and Statutory Index, at 23. Probation's recommendation is almost *triple* of that average and the high-

end guideline range for Mr. Jones of 33 months.

Even more to the point is the disparity this would create with other defendants charged with engaging in similar conduct at FCI at the same time. Consider Ray Garcia. Mr. Garcia was the warden. Unlike Mr. Jones, he was the "most powerful person in the prison." *U.S. v. Garcia*, No. 21-CR-00429, United States' Sentencing Memorandum and Motion for Upward Departure or Upward Variance, at 1. He "created and perpetuated a culture of abuse." *Id.*, at 6. Key differences exist between Mr. Garcia and Mr. Jones's conduct, too. Unlike Mr. Jones, Mr. Garcia fought his charges. He went to trial and was convicted of abusing three different inmates. Even then, he continued to show a lack of remorse and acceptance of responsibility, going so far as to suggest that there were "no victims" in the case. *Id.* at 6. He took naked photos of victims. *Id.* at 3-4. He instructed one victim to insert a candy cane into her vagina. *Id.* at 3. This Court imposed a sentence of **70** custodial months. There is no justification for imposing a higher sentence on Mr. Jones.

### 4. The Need to Provide Restitution

Probation has not yet recommended a specified restitution amount in this case. PSR at ¶ 116. Regardless, the need to provide restitution to the victims in this case does not justify imposing an upward variance nearly triple the high-end of the appropriate guideline range.

### C. The Appropriate Sentence

In light of the above, there is no justification for Probation's recommendation of 96 months. It is at odds with the Guidelines, sentences of similarly situated defendants, and the nature and character of Mr. Jones. Mr. Jones's conduct falls squarely within the heartland of conduct encompassed by the guidelines. He should receive a guideline sentence. And, in light of Mr. Jones's history and the circumstances surrounding his incarceration, he should receive at most a sentence at the middle of the Guideline range.

## IV. MR. JONES SHOULD NOT BE REMANDED AT SENTENCING

Probation states that Mr. Jones is not considered to be a good candidate for voluntary surrender. PSR at p. 28. Its only basis for that conclusion is that Mr. Jones's pretrial release was

restricted under 18 U.S.C. § 3143. *Id.* There is nothing in that section requiring Mr. Jones to be remanded. Mr. Jones pleaded guilty. He has complied with every single one of his pretrial conditions. And he has cooperated with the government and Probation. That record and his demonstrated commitment to his young family is ample evidence he is not a flight risk. Mr. Jones is prepared to comply with whatever conditions the Court might impose to ensure his self-surrender at his assigned institution.

### V. CONCLUSION

Probation's recommendation is at odds with the Guidelines, sentences for similarly situated defendants, and, perhaps most importantly, the nature and character of Mr. Jones. On the day of Mr. Jones's sentencing, the Court will consider Mr. Jones "on that day, not on the date of his offense…." *Conception v. United States*, 142 S. Ct. 2389, 2395-96 (2022) [internal citations and quotations omitted]. The Court will be sentencing someone who, despite committing crimes in the worst year of his life, has otherwise led a law-abiding life dedicated to serving our country. Mr. Jones requests that the Court impose a sentence in the middle of the Guideline range.

Dated: November 8, 2023

MORRISON & FOERSTER LLP

By: */s/ Ramsey W. Fisher*
Ramsey W. Fisher

*Attorneys for Defendant*
ANDREW JONES